FILED
CLERK, U.S. DISTRICT COURT

APR - 3 2008

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ADEKUNLE OLOBA-AISONY,                 )   NO. CV 06-4976-SGL(E)
                                       )
            Petitioner,                )
                                       )
     v.                                )   ORDER ADOPTING FINDINGS,
                                       )
L.E. SCRIBNER, Warden,                 )   CONCLUSIONS AND RECOMMENDATIONS OF
                                       )
            Respondent.                )   UNITED STATES MAGISTRATE JUDGE
                                       )
_____)

        Pursuant to 28 U.S.C. section 636, the Court has reviewed the

Petition, all of the records herein and the attached Report and

Recommendation of United States Magistrate Judge.  The Court approves

and adopts the Magistrate Judge's Report and Recommendation.

        IT IS ORDERED that Judgment be entered denying and dismissing the

Petition with prejudice.

///

///

///

///

1     IT IS FURTHER ORDERED that the Clerk serve copies of this Order,

2  the Magistrate Judge's Report and Recommendation and the Judgment

3  herein by United States mail on Petitioner and counsel for Respondent.

4

5     LET JUDGMENT BE ENTERED ACCORDINGLY.

6

7     DATED:    3- 31        , 2008.

8

9

                         STEPHEN G. LARSON

10               UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8        **UNITED STATES DISTRICT COURT**

9        **CENTRAL DISTRICT OF CALIFORNIA**

10

11 ADEKUNLE OLOBA-AISONY,      ) NO. CV 06-4976-SGL(E)
              )
12        Petitioner,    )
              )
13    v.           ) REPORT AND RECOMMENDATION OF
              )
14 L.E. SCRIBNER, Warden,     ) UNITED STATES MAGISTRATE JUDGE
              )
15        Respondent.   )
              )
16 _____ )

17

18    This Report and Recommendation is submitted to the Honorable

19 Stephen G. Larson, United States District Judge, pursuant to the

20 provisions of 28 U.S.C. section 636 and General Order 05-07 of the

21 United States District Court for the Central District of California.

22

23          **PROCEEDINGS**

24

25    Petitioner filed a "Petition for Writ of Habeas Corpus By a

26 Person in State Custody" on August 10, 2006, challenging Petitioner's

27 conviction in Los Angeles Superior Court case number GA049677

28 ("Petition I").  On October 19, 2006, Petitioner filed another habeas

1  corpus action, <u>Oloba-Aisony v. Scribner</u>, CV 06-6652-SGL (E),

2  challenging the same conviction on additional grounds ("Petition II").

3  On October 24, 2006, the Court issued an order consolidating the

4  present action with <u>Oloba-Aisony v. Scribner</u>, CV 06-6652-SGL (E), and

5  ordering Respondent to file a single Answer to the consolidated

6  Petitions.  On January 8, 2007, Respondent filed an Answer.  On

7  March 30, 2007, Petitioner filed a Traverse.

8

9      In Petition II, Petitioner contends that the sentencing court

10  imposed an upper term sentence in violation of <u>Blakely v. Washington</u>,

11  542 U.S. 296 (2004) ("<u>Blakely</u>").  In the Traverse, Petitioner contends

12  the sentencing court imposed an upper term sentence in violation of

13  <u>Blakely</u> and <u>Cunningham v. California</u>, 127 S. Ct. 856 (2007)

14  ("<u>Cunningham</u>") (<u>see</u> Traverse, pp. 55-61).  On April 4, 2007, the Court

15  issued an Order to Show Cause, requiring Petitioner to show cause why

16  the Court should not require further exhaustion of Petitioner's

17  challenge to his sentence in light of <u>Cunningham</u>.  On May 25, 2007,

18  the Court issued an order staying the consolidated Petitions pending

19  exhaustion of Petitioner's challenge to his sentence.

20

21      On December 11, 2007, Petitioner filed a "Motion Requesting That

22  Petitioner's Stay Be Lifted."  By order filed December 12, 2007, the

23  Court lifted the stay and took the consolidated Petitions under

24  submission.

25  ///

26  ///

27  ///

28  ///

2

**BACKGROUND**

A jury found Petitioner guilty of: (1) the forcible rape of Tiana W. (Count 1); (2) sexual penetration of Tiana W. by a foreign object (Count 2); (3) attempted forcible oral copulation of Tiana W. (Count 3); (4) three counts of felony false imprisonment by violence of Tiana W., Ashley B. and Brittany H. (Counts 4, 5 and 10); (5) three counts of misdemeanor battery of Yana J., Cheryl J. and Lauren C. (Counts 7, 11 and 12); (6) assault of Brittany H. with intent to commit a felony (Count 8); and sexual battery by restraint of Brittany H. (Count 9) (Clerk's Transcript ["C.T."] 257-68, 271-74; Reporter's Transcript ["R.T."] 1804-11).  The jury acquitted Petitioner of the alleged battery of Amy B. (Count 6) (C.T. 262, 272-73).  Petitioner received a prison sentence of ten years (C.T. 275-83; R.T. 2126-31).

The Court of Appeal affirmed the judgment (Respondent's Lodgment 6; see People v. Aisony, 2003 WL 22792349 (Cal. Ct. App. 2d Dist. Nov. 25, 2003).  On February 18, 2004, the California Supreme Court denied Petitioner's petition for review without opinion (Respondent's Lodgment 8).

Petitioner filed a habeas petition in the Los Angeles County Superior Court, which that court denied on May 20, 2004 in a brief, one-page order (Respondent's Lodgments 9, 10).  Petitioner filed a habeas petition in the California Court of Appeal, which that court denied summarily on September 14, 2004 (Respondent's Lodgments 11, 12).  On October 7, 2004, Petitioner filed a habeas petition in the California Supreme Court, which that court denied without opinion on

3

1  August 31, 2005 (Respondent's Lodgments 13, 14).

2

3      On November 30, 2004, Petitioner filed a second habeas petition

4  in the Los Angeles County Superior Court, which that court denied on

5  the same date (Respondent's Lodgments 15, 16).  On January 6, 2005,

6  Petitioner filed a second habeas petition in the California Court of

7  Appeal, which that court summarily denied on September 13, 2005

8  (Respondent's Lodgments 17, 18).  On November 1, 2005, Petitioner

9  filed a second habeas petition in the California Supreme Court, which

10  that court summarily denied on August 2, 2006 (Respondent's Lodgments

11  19, 20).

12

13      On June 15, 2007, Petitioner filed a third habeas petition in the

14  California Supreme Court,[1] which that court denied on November 28,

15  2007 (Petitioner's exhibit to "Motion Requesting That Petitioner's

16  Stay Be Lifted").

17

18                      **SUMMARY OF TRIAL EVIDENCE**

19

20      The following factual summary is taken from the opinion of the

21  California Court of Appeal in People v. Aisony, 2003 WL 22792349 (Cal.

22  Ct. App. Nov. 25, 2003).  See Galvan v. Alaska Dep't of Corrections,

23  397 F.3d 1198, 1199 & n.1 (9th Cir. 2005) (taking factual summary from

24  ────────────────

25      [1]  The record does not contain this petition.  However,
    the Court takes judicial notice of the docket in In re Oloba-

26  Aisony, California Supreme Court case number S153840, available
    on the California courts' website at www.courtinfo.ca.gov.  See

27  Mir v. Little Company of Mary Hosp., 844 F.2d 646, 649 (9th Cir.
    1988).  That docket shows Petitioner filed the petition in that

28  case on June 15, 2007.

                                  4

1  state appellate decision).

2

3                                    *FACTS*

4

5        *Counts 1-4 re Tiana W.*

6

7
        Tiana W., then age 17, met appellant several times walking
8
        on the street in the neighborhood where they both lived in
9
        Pasadena.  In March of 2002, Tiana met appellant at a bus
10
        stop.  Appellant told her his name was "Kule," showed her
11
        his passport and a blue passbook, and told her he was a
12
        Nigerian prince with lots of money.  Tiana gave him her cell
13
        phone number.  Appellant called her on March 12, 2002, the
14
        day before her 18th birthday, and told her he wanted to meet
15
        her at the corner of Grandview and Marengo to give her a
16
        birthday gift.
17

18
        Tiana met appellant, who told her he wanted to give her
19
        $1,000.  Appellant had an envelope containing money with
20
        him, but he did not want to give her the money at that time.
21
        Tiana was on her way to meet her boyfriend and told
22
        appellant that she would call him when she got back.  Later
23
        that evening, she spoke with appellant who again asked to
24
        meet her.
25

26

27      Tiana again met appellant at the corner of Grandview and

28      Marengo.  They walked until they were under a bridge.

                                      5

1    Appellant tried to hug and kiss Tiana, but she pushed him

2    away told him, "What are you doing?  Move.  I'm not an

3    affectionate person."  Tiana also told appellant she did not

4    like him "like that."  When appellant asked if he could

5    "lick" her, she said, "No.  Just leave me alone."  When

6    appellant became more affectionate and aggressive, she told

7    him, "Stop.  No.  Move."

8

9    Appellant then pulled down Tiana's sweat pants, shorts, and

10   underwear and tried to lick her.  Tiana pulled her clothing

11   back up, but appellant pulled them down again.  Appellant

12   twisted Tiana's wrist and held her leg.  She told him to

13   stop and kept telling him "Stop.  What are you doing?

14   You're raping me."  Appellant told Tiana, "You can go ahead

15   and yell all you want to.  No one is going to hear you."

16   Tiana was scared and nervous and began to cry.  She

17   protested to appellant, "Don't do this to me," but he

18   removed everything she was wearing below her waist and threw

19   it to the side.

20

21   When appellant attempted to put his tongue into her vagina,

22   she put her legs together so he could only put his tongue on

23   her pubic hairs.  But appellant then put his finger inside

24   Tiana's vagina and asked her to let him "just rub my penis

25   on you."  Appellant put on a condom, Tiana again protested,

26   and appellant started rubbing his penis on her.  When she

27   held his penis and rubbed it on herself in an effort to

28   satisfy appellant so he would leave her alone, appellant

6

1    told her, "No.   No.   That's not good enough."

2

3    Appellant then grabbed Tiana's feet, laid her on the ground,

4    and pushed his penis inside her vagina.   Appellant kept

5    "jamming" himself into her until he ejaculated.   He got up,

6    threw the condom away, and told Tiana not to tell anyone

7    what had happened and that he would transfer $10,000 into

8    her account.

9

10   Tiana ran home, showered, and then told her cousin what had

11   happened.   Her cousin told her to call the police and dialed

12   the number for her.   The police arrived and brought her back

13   to the scene of the rape where they took pictures and

14   recovered the condom.   Tiana was taken to a hospital and

15   examined.   She had some swelling, redness, abrasions and a

16   laceration in the vaginal area consistent with her having

17   been raped earlier that evening.

18

19   *Count 5 re Ashley B.*

20

21   In February of 2002, Ashley B. was sitting in front of a

22   fountain at the University of Southern California where she

23   was a student.   Appellant approached Ashley, stated he was

24   producing a television show, and asked her if she had ever

25   done any advertising.   When Ashley said she had not,

26   appellant asked her if she would like to talk about it with

27   him.   They agreed to meet at the fountain later that

28   afternoon, and appellant asked if she was interested in

7

1    seeing his brother who allegedly played for the Clippers.

2

3    After they met at the fountain, they walked to the track

4    office because appellant claimed he had a meeting with the

5    track coach.  As they were waiting, appellant told Ashley

6    that he was from Nigeria, had gone to Oxford in England, and

7    was a producer.  Appellant also showed her a bank passbook,

8    and asked her, "How much money should I put in your bank

9    account?  How about $600?"  When Ashley asked why he would

10    do that, appellant responded, "Well if you're going to ask

11    why, I'm not going to do it.  Who asks why?"

12

13    Appellant then told Ashley that he would take her shopping.

14    Ashley stated that she did not want to go shopping with

15    appellant or take his money because she did not know him.

16    However, Ashley gave appellant her cell phone number.

17

18    Appellant and Ashley spoke briefly a few times on the phone.

19    On February 18, 2002, appellant called her and told her he

20    had just gotten a big check and that he was in Pasadena with

21    Spike Lee for a movie opening.  At first, Ashley did not

22    want to meet him, but then reconsidered because she thought

23    it would be in a public area.  She agreed to meet him at The

24    Gap clothing store in Pasadena.  Once there, appellant told

25    Ashley that she could purchase some items she had tried on,

26    or he would just give her $500 in cash.  When Ashley chose

27    the cash, they drove in Ashley's car to a bank ATM machine.

28    However, Ashley noticed that appellant had purportedly

8

1   gotten the money very quickly and then realized that the ATM

2   machine was actually across the street from appellant.

3

4    Appellant got back into the car, and they went to a

5   Starbucks where appellant bought some coffee for them both.

6   When Ashley said she had to leave, appellant asked to be

7   driven to a friend's house.  However, appellant directed her

8   to the parking lot of a Laundromat, which was sparsely lit

9   and where no other cars were located.  They talked for a few

10  minutes, and then appellant touched Ashley on her leg.

11  Ashley told appellant to stop and pushed his hand away.

12  Appellant told Ashley, "I don't want to have sex with you.

13  I just want to feel you.  I want to be one with you."

14

15  Ashley turned the car engine on, and appellant told her to

16  drive behind two buildings.  She drove to the location, but

17  made sure that the car could still be seen from the street.

18  There were no lights, but there was a van parked nearby with

19  a person standing next to it.  When appellant took the keys

20  out of the ignition, Ashley became scared.  She asked for

21  the keys back, but appellant would not give them to her and

22  said, "You don't want to see me get angry.  It's not a good

23  thing for me to get angry."  Appellant then said, "You want

24  to leave here in peace and not in pieces, right?"  He added,

25  "this is going to happen tonight," and "This is a bad

26  neighborhood," and "Do you know what wasting someone means?"

27

28  Ashley was terrified and shaking.  Appellant told her to go

1   ahead and scream because no one would care.  Ashley knew

2   that appellant had the car keys, and surmised that because

3   he knew the track coach at her school he could chase and

4   catch her if she tried to run away.  Just then a Pasadena

5   police car pulled up behind Ashley's car, and the officer

6   shined a bright light into her car.  Pasadena Police Officer

7   Diego Torres told appellant and Ashley that the area they

8   were in was not safe and that they should leave.  Ashley

9   grabbed back her keys, jumped out of the car, and ran toward

10  Officer Torres.  She was nervous, shaken up and scared.

11  Ashley told the officer about appellant's threats and asked

12  him to help her.  The officer asked appellant to get out of

13  the car.  Ashley drove away, and appellant walked away.

14

15  Approximately three weeks later, appellant called Ashley on

16  her cell phone and told her she looked cute today.  Ashley

17  hung up the phone, but when she turned around a few minutes

18  later, she saw appellant.  Ashley left.

19

20  *Count 7 re Yana J.*

21

22  Yana J. attended Pasadena City College and worked in the

23  physical education department there.  Appellant was on the

24  track team, and Yana had given him some equipment to use.

25  In early February of 2002, appellant approached Yana as she

26  waited for a friend.  Appellant told her he was a prince in

27  Nigeria, that he had money, and he could buy things for her.

28  Appellant also made a comment about American women that

1   offended her, and Yana left when her friend arrived.

2

3   On February 13, 2002, Yana was walking on campus with her

4   cousin when she overheard appellant tell another woman that

5   he was [a] prince and had money.  As Yana passed by, she

6   commented that appellant was lying.  Yana and her cousin

7   then went into a gym building.  While inside the gym and

8   waiting for her cousin, appellant approached Yana, punched

9   her hard in the chest causing her to fall back onto a desk,

10   and threatened that, "If you say something else to her, I'm

11   going to fucking kill you."

12

13   Yana filed a complaint with the campus police.  Soon

14   thereafter, as Yana and her cousin walked across the campus,

15   appellant walked behind them and started cussing.  Yana's

16   cousin contacted the Pasadena Police on her cell phone.  The

17   police arrived and spoke with the campus police, who

18   indicated that the incident had been handled.

19

20   *Counts 8, 9 and 10 re Brittany H.*

21

22   In March of 2002, Brittany H., who was 15 years old, went to

23   meet her mother at Pasadena City College.  Brittany went to

24   the gym looking for her mother.  As she left the gym,

25   appellant approached her, and she recognized appellant as a

26   friend of her mother's friend.  Appellant offered her a ride

27   home, and got into a car driven by appellant's friend,

28   Jonathan.

1   As they drove, Brittany pointed out her house.  But Jonathan

2   did not stop the car.  Appellant told Brittany that he

3   needed to go to his house to get some money.  Once they

4   reached appellant's house, appellant told Brittany to get

5   out of the car.  She said she was fine in the car, but

6   appellant asserted that Jonathan was going to leave and

7   needed his car.  Brittany kept asking if appellant was going

8   to take her home.

9

10  Appellant took Brittany through the house and into his

11  bedroom.  She considered running out, but thought appellant

12  or Jonathan would grab her.  Brittany sat on the bed, and

13  Jonathan gathered his things and left.  Brittany kept asking

14  appellant how he was going to get her home.  She felt very

15  scared.  After Jonathan left the room, appellant turned off

16  the lights, pushed Brittany down on the bed, and got on top

17  of her.  Appellant took off his shoes and started unbuckling

18  Brittany's belt and unzipping her pants.  Appellant took off

19  his pants and with his boxer shorts still on began grinding

20  his penis against Brittany's leg.  She was scared and could

21  not move.

22

23  When Brittany started to scream and cry, appellant asserted,

24  "Bitch, you're going to let me do this."  She screamed for

25  appellant to get off her and hit appellant in the face.

26  Appellant grabbed Brittany's breasts, squeezed them hard,

27  and kissed her on the neck as she continued hitting him.

28  ///

12

1    Appellant eventually got off of Brittany and went to the

2    bathroom.  While he was in the bathroom, she ran out of the

3    house.  Appellant ran after her and shouted that she had

4    purportedly stolen something from his house.  When appellant

5    caught up with Brittany, he asked why she ran away.  She

6    stated that she was scared and he had just attacked her.

7

8    At that moment, two people in a car drove by and asked if

9    anything was wrong.  Brittany got in the car, and the couple

10   drove her to her grandmother's house.  Brittany told her

11   grandmother what had happened, and a friend later contacted

12   the police.

13

14   *Count 11 re Cheryl J.*

15

16   Cheryl J. worked at Pasadena City College in the student

17   loan and grants office and took classes at the college.

18   Sometime during the last week in February, appellant

19   approached Cheryl as she was leaving class and walking back

20   to her office.  Appellant told her he had been watching her

21   and wanted to get to know her better.  Appellant told her he

22   was from Nigeria, had lived in London, and had a million and

23   half dollars in a bank account.  He showed her a bank

24   passbook and his passport, which had the word "Prince"

25   before his name.

26

27   When appellant said he wanted to get something to eat,

28   Cheryl agreed to go with him when she was done with work.

13

1   Later, as Cheryl drove to the restaurant, appellant placed

2   his hand on her thigh.  She moved his hand away, but several

3   minutes later, he placed his hand there again.  Cheryl asked

4   him to stop and moved his hand away again.

5

6   The following day, Cheryl and an African friend went to a

7   restaurant with appellant.  During their meal, appellant

8   discussed his religious views toward women.  He believed

9   that women were evil and men had been placed in control of

10  them for that reason.  This conversation made Cheryl

11  uncomfortable.  Afterwards, she dropped appellant off at his

12  house and told him she did not want to see him anymore.

13

14  Nevertheless, appellant continued to come by Cheryl's office

15  on campus in an attempt to continue meeting with her.  Many

16  times Cheryl had the receptionist at the front desk tell

17  appellant that she was not there.  One day, appellant

18  started screaming and yelling at Cheryl.  She again told

19  appellant she did not want to see him any more.  Cheryl told

20  the people in the front office area to keep the front door

21  closed so appellant could not just walk into her office.  A

22  few days later, appellant came by Cheryl's office, and she

23  hid under her desk to avoid contact with him.

24

25  On another occasion, appellant waited three hours outside

26  Cheryl's office until she got off work.  He wanted to walk

27  Cheryl to her car.  As they walked down the stairs,

28  appellant grabbed Cheryl by the arms and kissed her on the

14

mouth.  She pushed him away and told him to stop.  Once they
arrived at her car, appellant cursed at Cheryl.

*Count 12 re Lauren C.*

Lauren C. was a student at Pasadena City College.  Appellant
approached Lauren as she waited in line during the
enrollment process at the college.  Appellant told her that
he worked at the school and had been watching her from his
office.  Appellant asked Lauren for her phone number, but
she did not give it to him.  Appellant told her he was a
prince and showed her his passport.  He also told her he had
lots of money and showed her his bankcard.  Appellant
offered to take Lauren shopping or to give her money if she
went out with him.  Lauren repeatedly said no and told
appellant that she was not interested.

As Lauren walked to her car, appellant followed her.  He
kept asking her for her phone number, and she refused to
give it to him.  When Lauren arrived at her car, opened the
door and sat down, appellant crouched down next to the door.
Lauren tried to close the door, but appellant kept pushing
it open.  Lauren repeatedly told him she had to leave.
Appellant did not move away, and then he put his hand on her
leg and stroked it up and down.  When Lauren told him not to
touch her, appellant stated, "The more you say no, the more
I'm going to want to do it."  Lauren became scared and just
drove off, not caring if she injured appellant with the car.

1   Lauren immediately drove to see her father, who reported the

2   incident to the Pasadena Police Department.

3

4   *Defense evidence*

5

6   Appellant's defense evidence at trial focused only on the

7   counts pertaining to Brittany H.  A former roommate of

8   appellant's testified in part that he saw appellant and

9   Brittany embracing and kissing on the bed, and that she did

10   not appear to be in any distress.

11

12

13   **PETITIONER'S CONTENTIONS**

14

15   Petitioner contends:

16

17   1.  Petitioner allegedly is actually innocent (Petition I, p. 5;

18   Attachment to Petition I, pp. 1-5);

19

20   2.  The evidence allegedly was insufficient to support

21   Petitioner's conviction (Attachment to Petition I, pp. 5-8);

22

23   3.  The State allegedly violated the "Vienna Convention,"[2]

24   assertedly by failing to notify Petitioner's consulate of Petitioner's

25   arrest and to inform Petitioner that he had a right to contact his

26   consulate (Petition I, p. 6; Attachment to Petition I, pp. 12-13);

27   _____

28   [2]   Vienna Convention on Consular Relations, 21 U.S.T. 77
     (April 24, 1963).

16

1    4.   The trial court's refusal to sever the counts allegedly
2 violated Due Process (Petition I, pp. 5-6; Attachment to Petition I,
3 pp. 8-9);

4

5    5.   The trial court allegedly violated the Constitution by
6 denying Petitioner's motion to substitute counsel made pursuant to
7 People v. Marsden[3] (Attachment to Petition I, p. 11);

8

9    6.   The trial court allegedly denied Petitioner his
10 Constitutional right of self-representation (Petition I, p. 6;
11 Attachment to Petition I, pp. 13-14);

12

13    7.   Petitioner's jury allegedly was not drawn from a fair cross-
14 section of the community (Attachment to Petition I, p. 15; Traverse,
15 pp. 52-53);

16

17    8.   The prosecutor allegedly violated the Constitution by
18 assertedly using peremptory challenges to strike two African-American
19 jurors in violation of Batson v. Kentucky[4] (Attachment to Petition I,
20 pp. 15-16; Traverse, pp. 53-54);

21

22    9.   Petitioner's trial counsel allegedly rendered ineffective
23 assistance, assertedly by:

24 ///

25 ///

26 _____

27    [3]   2 Cal. 3d 118, 84 Cal. Rptr. 156, 465 P.2d 44 (1970).

28    [4]   476 U.S. 79 (1986).

17

a.   failing to investigate witnesses and assertedly exculpatory evidence (Petition I, p. 6; Attachment to Petition I, pp. 9-10);

b.   failing to object to the "insufficient evidence, bogus charges and the inconsistent statement [sic] offered by the state"; (Attachment to Petition I, p. 10);

c.   lying to Petitioner and signing a request for a continuance in Petitioner's name (Attachment to Petition I, p. 10);

d.   refusing to allow Petitioner access to transcripts and falsely telling the court that counsel had provided Petitioner with the transcripts (Attachment to Petition I, p. 10);

e.   turning information over to the police which allegedly led to the filing of new charges against Petitioner (Attachment to Petition I, p. 10);

f.   failing to object to the prosecution's allegedly discriminatory selection of jurors (Attachment to Petition I, p. 11); and

g.   advising Petitioner not to testify (Attachment to Petition I, p. 11);

///
///

18

1       10.    Petitioner's appellate counsel allegedly rendered

2   ineffective assistance, assertedly by failing to challenge on appeal:

3

4          a.    the trial court's denial of Petitioner's request for

5       self-representation;

6

7          b.    state officials' alleged failure to inform Petitioner's

8       consulate of Petitioner's arrest; and

9

10         c.    the allegedly ineffective assistance of trial counsel in

11      assertedly failing to investigate and prepare Petitioner's case

12      (Petition II, p. 5; Attachment to Petition II, pp. 4-6; Traverse,

13       pp. 61-64); and

14

15      11.    Petitioner's upper term sentence allegedly violates <u>Blakely</u>

16  and <u>Cunningham</u> (Petition II, p. 5; Attachment to Petition II, pp. 1-3;

17  Traverse, pp. 55-61).

18

19                          **STANDARD OF REVIEW**

20

21      A federal court may not grant an application for writ of habeas

22  corpus on behalf of a person in state custody with respect to any

23  claim that was adjudicated on the merits in state court proceedings

24  unless the adjudication of the claim: (1) "resulted in a decision that

25  was contrary to, or involved an unreasonable application of, clearly

26  established Federal law, as determined by the Supreme Court of the

27  United States"; or (2) "resulted in a decision that was based on an

28  unreasonable determination of the facts in light of the evidence

1  presented in the State court proceeding." 28 U.S.C. § 2254(d);
2  Woodford v. Visciotti, 537 U.S. 19, 24-26 (2002); Early v. Packer, 537
3  U.S. 3, 8 (2002); Williams v. Taylor, 529 U.S. 362, 405-09 (2000).

4

5       "Clearly established Federal law" refers to the governing legal
6  principle or principles set forth by the Supreme Court at the time the
7  state court renders its decision.  Lockyer v. Andrade, 538 U.S. 63
8  (2003).  "Clearly established Federal law" refers to the holdings, not
9  dicta, of the United States Supreme Court at the time of the relevant
10 state court decision.  Carey v. Musladin, 127 S. Ct. 649, 653 (2006).
11 "What matters are the holdings of the Supreme Court, not the holdings
12 of lower federal courts."  Plumlee v. Masto, ___, F.3d ___, 2008 WL
13 151273, at *6 (9th Cir. Jan. 17, 2008) (en banc).

14

15      A state court's decision is "contrary to" clearly established
16 Federal law if: (1) it applies a rule that contradicts governing
17 Supreme Court law; or (2) it "confronts a set of facts . . .
18 materially indistinguishable" from a decision of the Supreme Court but
19 reaches a different result.  See Early v. Packer, 537 U.S. at 8
20 (citation omitted); Williams v. Taylor, 529 U.S. at 405-06.

21

22      Under the "unreasonable application prong" of section 2254(d)(1),
23 a federal court may grant habeas relief "based on the application of a
24 governing legal principle to a set of facts different from those of
25 the case in which the principle was announced."  Lockyer v. Andrade,
26 538 U.S. at 76 (citation omitted); see also Woodford v. Visciotti, 537
27 U.S. at 24-26 (state court decision "involves an unreasonable
28 application" of clearly established federal law if it identifies the

1  correct governing Supreme Court law but unreasonably applies the law

2  to the facts).  A state court's decision "involves an unreasonable

3  application of [Supreme Court] precedent if the state court either

4  unreasonably extends a legal principle from [Supreme Court] precedent

5  to a new context where it should not apply, or unreasonably refuses to

6  extend that principle to a new context where it should apply."

7  Williams v. Taylor, 529 U.S. at 407 (citation omitted).

8

9       "In order for a federal court to find a state court's application

10  of [Supreme Court] precedent 'unreasonable,' the state court's

11  decision must have been more than incorrect or erroneous."  Wiggins v.

12  Smith, 539 U.S. 510, 520 (2003) (citation omitted).  "The state

13  court's application must have been 'objectively unreasonable.'"  Id.

14  at 520-21 (citation omitted); see also Clark v. Murphy, 331 F.3d 1062,

15  1068 (9th Cir.), cert. denied, 540 U.S. 968 (2003).  In applying these

16  standards, this Court looks to the last reasoned state court decision.

17  See Medley v. Runnels, 506 F.3d 857, 862 (9th Cir. 2007).  To the

18  extent no such reasoned opinion exists, as where a state court

19  rejected a claim in an unreasoned order, this Court must conduct an

20  independent review to determine whether the decisions were contrary

21  to, or involved an unreasonable application of, "clearly established"

22  Supreme Court precedent.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th

23  Cir. 2000).

24  ///

25  ///

26  ///

27  ///

28  ///

1      **DISCUSSION**

2

3          For the reasons discussed below, the Petition should be denied

4      and dismissed on the merits with prejudice.[5]

5

6      I.   <u>Petitioner Is Not Entitled to Habeas Relief on His Claim of</u>

7           <u>Actual Innocence.</u>

8

9          The Supreme Court has never decided whether a habeas petitioner

10     may obtain relief by asserting a freestanding claim of actual

11     innocence.   In <u>Herrera v. Collins</u>, 506 U.S. 390, 400 (1993)

12     ("<u>Herrera</u>"), the Court recognized that "[c]laims of actual innocence

13     based on newly discovered evidence have never been held to state a

14     ground for federal habeas relief absent an independent constitutional

15     violation occurring in the underlying state proceeding."   The <u>Herrera</u>

16     Court assumed, without deciding, "that in a capital case a truly

17     persuasive demonstration of 'actual innocence' made after trial would

18     render the execution of a defendant unconstitutional, and warrant

19     federal relief if there were no state avenue open to process such a

20     _____

21          [5]   The Court has read, considered and rejected on the
       merits all of Petitioner's contentions.   The Court discusses
22     Petitioner's principal contentions herein.

23          The Court also assumes, <u>arguendo</u>, Petitioner has not
       procedurally defaulted any of his claims.   <u>See</u> <u>Lambrix v.</u>
24     <u>Singletary</u>, 520 U.S. 518, 523-25 (1997); <u>Franklin v. Johnson</u>,
       290 F.3d 1223, 1229, 1232-33 (9th Cir. 2002); <u>see also</u> <u>Barrett v.</u>
25     <u>Acevedo</u>, 169 F.3d 1155, 1162 (8th Cir.), <u>cert. denied</u>, 528 U.S.
       846 (1999) ("judicial economy sometimes dictates reaching the
26     merits if the merits are easily resolvable against a petitioner
       while the procedural bar issues are complicated").
27

28

1  claim," but ruled that the petitioner in that case had not made such a

2  showing.  Id. at 417.  In House v. Bell, 126 S. Ct. 2064, 2086-87

3  (2006), the Court again declined to decide whether federal habeas

4  courts may entertain freestanding claims of actual innocence.

5

6       The Supreme Court does permit a habeas petitioner to assert

7  actual innocence as a "gateway" claim permitting consideration of an

8  underlying procedurally defaulted constitutional claim.  See Schlup v.

9  Delo, 513 U.S. 298, 315 (1995) ("Schlup").  Under the Schlup standard,

10  to show actual innocence sufficient to overcome a procedural default,

11  a petitioner must furnish "'new reliable evidence . . . that was not

12  presented at trial.'"  See House v. Bell, 126 S. Ct. at 2077-78

13  (quoting Schlup, 513 U.S. at 324; ellipses added); Griffin v. Johnson,

14  350 F.3d 956, 963 (9th Cir. 2003), cert. denied, 541 U.S. 998 (2004).

15  The petitioner must "show that, in light of all available evidence, it

16  is more likely than not that no reasonable juror would convict him of

17  the relevant crime."  Smith v. Baldwin, 510 F.3d 1127, 1140 (9th Cir.

18  2007) (en banc) (citation and footnote omitted); see House v. Bell,

19  126 S. Ct. at 2077 ("A petitioner's burden at the gateway stage is to

20  demonstrate that more likely than not, in light of the new evidence,

21  no reasonable juror would find him guilty beyond a reasonable doubt -

22  or, to remove the double negative, that more likely than not any

23  reasonable juror would have reasonable doubt.").  This standard "is

24  demanding and permits review only in the 'extraordinary' case."  House

25  v. Bell, 126 S. Ct. at 2077 (citing Schlup, 513 U.S. at 327).

26

27       The showing required to establish a freestanding claim of actual

28  innocence is greater than that required to establish a Schlup

23

1  "gateway" claim.  See House v. Bell, 126 S. Ct. at 2086-87 (holding

2  petitioner satisfied Schlup actual innocence standard but did not meet

3  the "extraordinarily high" standard required for proof of a

4  freestanding claim of actual innocence); see also Schlup, 513 U.S. at

5  316.  Therefore, to the extent Petitioner cannot satisfy the Schlup

6  standard, he cannot satisfy the more exacting standard applicable to a

7  freestanding claim of actual innocence.

8

9       To establish a freestanding claim of actual innocence, a

10  petitioner must make a "stronger showing than the insufficiency of the

11  evidence to convict" showing adopted by the Supreme Court in Jackson

12  v. Virginia, 443 U.S. 307, 319 (1979).  See Carriger v. Stewart, 132

13  F.3d 463, 476 (9th Cir. 1997) (en banc), cert. denied, 523 U.S. 1133

14  (1998); see also House v. Bell, 126 S. Ct. at 2078 ("the gateway

15  actual-innocence standard is 'by no means equivalent to the standard

16  of Jackson v. Virginia, [citation],' which governs claims of

17  insufficient evidence") (citing Schlup, 513 U.S. at 330).  The

18  required showing "'must go beyond demonstrating doubt about [the

19  petitioner's] guilt, and must affirmatively prove that he is probably

20  innocent.'"  Boyde v. Brown, 404 F.3d 1159, 1168 (9th Cir. 2005),

21  amended on other grounds, 421 F.3d 1154 (9th Cir. 2005) (quoting

22  Carriger v. Stewart, 132 F.3d at 476; footnote omitted).  Post-

23  conviction evidence serving only to "undercut the evidence presented

24  at trial" does not suffice to meet this standard.  Carriger v.

25  Stewart, 132 F.3d at 477; see also Spivey v. Rocha, 194 F.3d 971, 979

26  (9th Cir. 1999), cert. denied, 531 U.S. 995 (2000) (habeas relief

27  unavailable where "the totality of the new evidence does not undermine

28  the structure of the prosecution's case").

1    In considering Petitioner's claim of actual innocence, the
2  Court's analysis is not limited to the allegedly new evidence
3  proffered by Petitioner.  See House v. Bell, 126 S. Ct. at 2077
4  (applying less onerous Schlup gateway standard); Schlup, 513 U.S. at
5  327; Carriger v. Stewart, 132 F.3d at 478.  Rather, the Court "must
6  consider all the evidence, old and new, incriminating and exculpatory,
7  without regard to whether it necessarily would be admitted under rules
8  of admissibility that would govern at trial."  House v. Bell, 126 S.
9  Ct. at 2077 (citations and internal quotations omitted).

10

11    A.    Charges Concerning Tiana W.

12

13    Petitioner contends evidence that Tiana W. made pretrial
14  statements assertedly inconsistent with her trial testimony shows
15  Petitioner's actual innocence of the offenses against Tiana.
16  Petitioner also contends the nurse's medical report shows Tiana did
17  not suffer any injuries, and that witnesses saw Petitioner and Tiana
18  laughing, talking and making calls in front of Petitioner's house
19  after the incident.  Petitioner relies on the following allegedly new
20  evidence:

21

22    1.  A "Forensic Nurse Examiner Narrative," dated May 13,
23       2002, indicating that Tiana stated, after the incident, that she
24       and Petitioner went to Petitioner's house and discovered he had
25       been locked out (Petition I, Ex. A).  Petitioner contends this
26       evidence shows Tiana was expecting Petitioner to pay her for
27       allegedly consensual sexual intercourse, and that Tiana lied at
28       trial when she testified that she walked home after the incident

25

1  (Attachment to Petition I, pp. 1-3).

2

3     2.   Handwritten notes allegedly recording Tiana's statements

4  to a district attorney, purporting to show that Tiana was

5  communicating with her boyfriend at 12:09 a.m. following the

6  incident (Petition I, Ex. B-1).  Petitioner contends this

7  evidence shows Tiana would have told her boyfriend if she really

8  had been raped (Attachment to Petition I, pp. 1-2).

9

10    3.   Two pages appearing to be taken from a police report,

11  dated May 13, 2002, which Petitioner contends show unspecified

12  inconsistencies between Tiana's statement to police and her trial

13  testimony (Petition I, Ex. B-2).

14

15    4.   A Forensic Medical Report, dated May 13, 2002,

16  purporting to record the result of the medical examination of

17  Tiana, which Petitioner contends shows that Tiana suffered no

18  "forcible trauma," scratches, bruises or redness (Petition I,

19  Ex. I; Attachment to Petition I, p. 2).

20

21    5.   Defense investigation reports, including a report

22  purporting to record an interview with Bioma ("Boo") Faulkner,

23  upon which Petitioner relies to show that Faulkner and another

24  person, Casey Whiedon, saw Petitioner and Tiana sitting, talking

25  and making calls in front of Petitioner's house in the early

26  hours of May 13, 2002 (Petition I, Ex. H; Attachment to

27

28

1     Petition I, p. 4; Traverse, p. 11).[6]

2

3     This alleged new evidence is manifestly insufficient to meet the

4     standard applicable to a freestanding claim of actual innocence.  The

5     alleged evidence that Tiana told the nurse Tiana walked to

6     Petitioner's house after the incident does not suffice; the "Forensic

7     Nurse Examiner Narrative" generally is consistent with Tiana's trial

8     testimony describing the sexual assault.  Alleged evidence that Tiana

9     made a phone call to her boyfriend or to others after the incident

10    does not suffice; Petitioner fails to provide any evidence to show

11    that Tiana did not report the assault to the boyfriend or to anyone

12    else to whom she assertedly made a call, but only speculates that she

13    did not do so.  In any event, a failure to report would not prove

14    probable innocence.  Petitioner offers two pages appearing to be from

15    a police report which Petitioner contends show inconsistencies between

16    Tiana's report to police and her trial testimony, but does not

17    identify any particular inconsistency, much less any inconsistency

18    which affirmatively shows Petitioner is actually innocent.  See

19    Carriger v. Stewart, 132 F.3d at 477 (rejecting freestanding claim of

20    actual innocence where nearly all of alleged new evidence "serve[d]

21    only to undercut the evidence presented at trial, not affirmatively to

22    prove Carriger's innocence"); Sistrunk v. Armenakis, 292 F.3d 669,

23    674-75 (9th Cir. 2002) (en banc), cert. denied, 537 U.S. 1115 (2003)

24    (rejecting Schlup claim based on impeachment evidence which did not

25    fundamentally call into question the reliability of petitioner's

26    _____

27         [6]    Petitioner spells Casey Whiedon's last name both as
      "Whiedon" and as "Wheidon" (see, e.g., Attachment to Petition I,
28    pp. 4, 9).  The Court uses the first spelling.

1  conviction); <u>Clark v. Lewis</u>, 1 F.3d 814, 824 (9th Cir. 1993) (evidence
2  attacking credibility of prosecution witness insufficient to establish
3  the defendant's actual innocence).

4

5  The Forensic Medical Report is not new evidence; it was admitted
6  at trial (<u>see</u> R.T. 902, 909-10, 1263).  Moreover, the Report records
7  that Tiana suffered labial swelling and a vaginal abrasion or
8  laceration, which the nurse testified were consistent with a recent
9  sexual assault (<u>see</u> Petition I, Ex. I; <u>see also</u> R.T. 912-13, 921-22).

10

11  Finally, although Petitioner contends "Boo" and Casey saw
12  Petitioner and Tiana laughing and talking at Petitioner's house after
13  the incident, the evidence Petitioner offers in support of this
14  assertion shows only that "Boo" assertedly told a defense investigator
15  that "Boo" knew and liked Petitioner, that Petitioner would bring
16  different girls to the house, that "Boo" did not think Petitioner was
17  the type to force himself on a girl, that "Boo" did not know who Casey
18  was, and that "Boo" had no names to give the investigator to "follow-
19  up with" and "had nothing more to say" (Petition I, Ex. H, p. 1).
20  This document falls well short of satisfying the exacting standard for
21  a freestanding claim of actual innocence.

22

23  Therefore, Petitioner has not met his burden to show that he is
24  actually innocent of the offenses against Tiana W.

25

26  B.  <u>Charges Concerning Yana J.</u>

27

28  Petitioner contends that allegedly new evidence shows

28

1  Petitioner's actual innocence of the charge of battery on Yana

2  (Traverse, pp. 8-9).  Petitioner relies on an Pasadena City College

3  Campus Police "Offense/Incident Report" and a "Pasadena Area Community

4  College District Field Interview Card" (Petition, Ex. D), claiming

5  that this evidence shows Yana J. falsely stated that Petitioner had

6  punched her in the chest.

7

8      The "Offense/Incident Report" indicates the report was prepared

9  on February 14, 2002 by Officer Hynes (Petition, Ex. D-1).  This

10 Report purports to record an incident on February 13, 2002 at

11 "1000hrs" [10 a.m.] (id.).  The report states that Reporting Officer

12 Hynes received a call to take a battery report (id.).  Yana told the

13 reporting officer that Petitioner punched her in the chest earlier

14 that day (Petition, Ex. D-1).  During the interview, Petitioner

15 entered the office and said he wanted to make a report concerning the

16 same incident, naming Yana as the suspect (id.).  Petitioner

17 assertedly said he did not strike or touch Yana (id.).  The report

18 states: "I advised both parties that I would make a report of the

19 incident describing the events as told to me and that the report would

20 be submitted to our investigators for follow-up.  The parties were

21 also advised to leave each other alone and not to make contact with

22 each other.  I might also add that I did not see any bruising or

23 redness to the exposed chest area of victim [Yana].  This area was

24 visible to the naked eye." (Petition Ex. D-1).

25

26     The "Field Interview Card" records an interview with Petitioner

27 on February 13, 2002 at "1323 hrs" [1:23 p.m.], and bears the names of

28 Officers Hynes and Lester (Petition, Ex. D-2).  It identifies Yana as

29

1 the "co-subject" (id.). Under the heading "Reason for Interview," the

2 "Field Interview Card" states: "co-subj. RPT's 242 PC by subj. intv.

3 indicates 242 PC complaint unfounded. R/P has history of sexual

4 encounter with male athletes i.e. football & basketball players.

5 Multiple encounters. Subj. had sex w R/P nite before, in GM bldg."

6 (id.). The disposition states: "Subj. advised & F.I." (id.).

7

8     These documents do not show Petitioner's actual innocence of the

9 battery on Yana. The "Field Interview Card" records Petitioner's

10 statements in the field interview conducted the day before the

11 "Offense/Incident Report" was prepared, and does not contain any

12 conclusion that the interviewing officer, or any police officer,

13 concluded that Yana's allegations were unfounded.

14

15     The "Offense/Incident Report" does not state that the reporting

16 officer concluded that Yana was not punched, but states only that the

17 officer did not observe any bruising or redness on the exposed part of

18 Yana's chest. Yana testified at trial that the officer to whom she

19 reported the incident asked Yana to pull down her tank top to see if

20 there was a bruise (R.T. 983-94). Yana testified that there was no

21 bruise, and that the officer said it looked like it could be red, but

22 declined to take a picture (R.T. 984). Petitioner's counsel asked:

23 "So as far as you can tell us today, nobody could see anything on your

24 chest," to which Yana responded: "No, sir." (R.T. 984). The

25 statements in the "Offense/Incident Report" are cumulative of this

26 testimony and do not constitute "new evidence" supporting a claim of

27 actual innocence. See Cooper v. Brown, 510 F.3d 870, 971 (9th Cir.

28 2007) (under Schlup, "Petitioner may not make a showing of actual

30

1  innocence based on what was known at the time of trial and presented

2  to the jury. [citations]."); Houston v. Castro, 2003 WL 21056800, at

3  *3 (N.D. Cal. May 8, 2003) (rejecting actual innocence exception to

4  statute of limitations, where petitioner presented no new evidence of

5  actual innocence, but only "the same evidence that the trial court

6  considered"); see also Bannister v. Delo, 100 F.3d 610, 618 (8th Cir.

7  1996), cert. denied, 521 U.S. 1126 (1997) ("putting a different spin

8  on evidence that was presented to a jury does not satisfy the

9  requirements set forth in Schlup"; citations, internal quotations and

10 brackets omitted); Gomez v. Jaimet, 350 F.3d 673, 680 (7th Cir. 2003)

11 (same, citing Bannister v. Delo).

13     Therefore, Petitioner has failed to show that it is more likely

14 than not that no reasonable juror considering the alleged evidence

15 contained in the "Offense/Incident Report" or the "Field Interview

16 Card" would have found Petitioner guilty of the battery of Yana J.

17 beyond a reasonable doubt.  See Carriger v. Stewart, 132 F.3d at 477;

18 Sistrunk v. Armenakis, 292 F.3d at 674-75; Clark v. Lewis, 1 F.3d at

19 824.  It follows that Petitioner has not satisfied the more stringent

20 standards applicable to a freestanding claim of actual innocence with

21 regard to the battery of Yana J.  See House v. Bell, 126 S. Ct. at

22 2086-87.

24     C.   **Charges Concerning Lauren C.**

26          1.   **Background**

28     On direct examination, the prosecutor asked Lauren C. if she had